# STATE OF MICHIGAN

# COURT OF APPEALS

---

ANDREW SHIRVELL,

       Claimant-Appellee,

v

DEPARTMENT OF ATTORNEY GENERAL,

       Appellant,

and

DEPARTMENT OF LICENSING AND
REGULATORY AFFAIRS/UNEMPLOYMENT
INSURANCE AGENCY,

       Respondent.

FOR PUBLICATION
January 8, 2015
9:00 a.m.

No. 314223
Ingham Circuit Court
LC No. 12-000344-AE

---

ANDREW SHIRVELL,

       Claimant-Appellee,

v

DEPARTMENT OF ATTORNEY GENERAL,

       Respondent,

and

DEPARTMENT OF LICENSING AND
REGULATORY AFFAIRS/UNEMPLOYMENT
INSURANCE,

       Appellant.

No. 314227
Ingham Circuit Court
LC No. 12-000344-AE

---

ANDREW SHIRVELL,

       Petitioner-Appellant,

-1-

v                                              No.  316146
                                               Ingham Circuit Court
DEPARTMENT OF ATTORNEY GENERAL,                LC No.  12-001089-AA

              Respondent-Appellee,
and

CIVIL SERVICE COMMISSION,

              Defendant-Appellee.
_____

Before:  MURRAY, P.J., and O'CONNELL and BORRELLO, JJ.

BORRELLO, J.

In these consolidated appeals, in Docket Nos. 314223 and 314227, the Department of Attorney General (the Department), and the Department of Licensing and Regulatory Affairs/Unemployment Insurance Agency (UIA), respectively, appeal by leave granted a circuit court order reversing the Michigan Compensation Appellate Commission's (MCAC's) order affirming the UIA's denial of claimant Andrew Shirvell's claim for unemployment benefits. In Docket No. 316146, Shirvell appeals by leave granted a circuit court order affirming a Civil Service Commission (the Commission) order denying Shirvell's grievance and holding that the Department had just-cause to terminate Shirvell's employment under the Civil Service Rules (CSRs) for conduct unbecoming a state employee. For the reasons set forth in this opinion, in Docket Nos. 314223 and 314227, we reverse the circuit court's order and remand for reinstatement of the MCAC's order and in Docket No. 316146, we affirm the circuit court's order.

## I.  BACKGROUND

These cases arise from Shirvell's highly-publicized conduct directed at Chris Armstrong in the summer and autumn of 2010. At the time, Armstrong was the president of the University of Michigan (U-M) Student Assembly (MSA) and was the first openly gay individual to hold that position. Shirvell was an assistant attorney general with the Department, in a position where he worked since 2007. It is undisputed that Shirvell received good performance evaluations during his tenure with the Department. However, on November 8, 2010, he was dismissed for conduct unbecoming a state employee.

The impetus behind the termination was Shirvell's actions surrounding his authoring a public blog entitled the "Chris Armstrong Watch." The blog contained various postings concerning Armstrong, his sexual orientation, and his "radical homosexual agenda." For example, one blog entry characterized Armstrong as a "RADICAL HOMOSEXUAL ACTIVIST, RACIST, ELITIST, & LIAR," and another entry contained a rainbow flag with a swastika posted next to a photograph of Armstrong's face with the word "resign" nearby. In one entry, Shirvell referred to Armstrong as a "privileged pervert." Shirvell accused Armstrong of supporting a "radical homosexual agenda" that included support for rights such as "gay 'marriage' and adoption 'rights,'" and a gender-neutral housing policy under which, according to

-2-

Shirvell, "cross-dressing students will not have to share a dorm room with a member of the same sex," and would "undoubtedly lead to a massive increase in rapes."

In addition, Shirvell claimed that Armstrong was a "racist liar" because he joined a campus group called the "Order of Angell," and that Armstrong demonstrated "a severe contempt for the First Amendment right to freedom of expression. Much like Nazi Germany's leaders, many of whom were also homosexuals. . . ." Shirvell accused Armstrong of engaging in "underage binge-drinking," using his "sexual preference to advance his ambitions," and claimed that Armstrong interned for Representative Nancy Pelosi "as a lowly handmaiden," and referred to him as the "grand dragon" of the MSA.

In addition, Shirvell accused Armstrong of hosting a "gay orgy" and asserted that Armstrong had a "tendency to engage in one-on-one casual 'gay' sexual encounters with friends. . . ." Shirvell asserted that the "gay orgy" "sheds new light on the deranged character of U of M's new student body president . . . [and] shows that Armstrong's push for 'gender neutral' housing . . . may be part of a broader agenda to allow 'gay residents to more easily engage in 'homosexual shenanigans' (read: orgies, underage binge-drinking, and probably illegal drug use, too)." Shirvell wrote similar things about Armstrong's friends and alleged that one male member of the MSA was Armstrong's "secret boyfriend" who was a "closet homosexual." In a television interview, Shirvell did not deny that on one occasion he referred to Armstrong as "Satan's representative" on the MSA on a separate Facebook page. In addition to the blog, Shirvell appeared outside Armstrong's residence and at events where Armstrong was present and held protest signs.

Initially, Shirvell maintained the blog under the pseudonym "Concerned Michigan Alumnus," however, on May 20, 2010, the newspaper *Between the Lines*, published an article identifying Shirvell as an "anti-gay heckler," author of the blog, and an assistant attorney general. Shortly thereafter, Shirvell and the blog became the subject of intense media scrutiny and in the summer and fall of 2010, Shirvell appeared on local and national news programs including Cable News Network's (CNN's) *Anderson Cooper AC360*, and Comedy Central's *The Daily Show*, to defend the blog. During the interviews, Shirvell explained that he was speaking as a private citizen and he refused to answer questions about his position with the Department. Nevertheless, the media outlets identified Shirvell as an assistant attorney general. In the interviews, Shirvell explained that he was opposed to Armstrong's policies, which he characterized as a "radical homosexual agenda," and denied that he had a personal agenda against Armstrong.

The fallout from the interviews was widespread. Former Michigan Attorney General Michael Cox took measures to clarify that Shirvell did not represent the views of the Department, sending an email to CNN and later appearing on *AC360* for an interview with Anderson Cooper. Cox explained that, although Shirvell was being a bully and his conduct was "offensive" and "unbecoming of civil discourse," Shirvell nevertheless had a First Amendment right to express his views. Shortly thereafter, the Michigan Civil Rights Commission and the Ann Arbor City Council passed resolutions condemning Shirvell's behavior and questioning Shirvell's impact on the Department's ability to fulfill its mission. In addition, U-M barred Shirvell from its campus for a time and Armstrong filed a petition for a Personal Protection Order (PPO), which was later dropped. Furthermore, according to testimony from officials

within the Department, the Department was inundated with negative e-mails and telephone calls opposed to Shirvell.

Finally, on November 8, 2010, following a disciplinary hearing, the Department terminated Shirvell's employment for "conduct unbecoming a state employee." The Department issued a termination letter to Shirvell that listed the reasons for the termination as follows:

> Engaging in inappropriate conduct by targeting individual members of the public both in person and through electronic media, which could reasonably be construed to be an invasion of privacy, slanderous, libelous, and tantamount to stalking behavior unbecoming an Assistant Attorney General.

> Engaging in conduct which resulted in filing of a request for a personal protection order against you for alleged stalking behavior.

> Conduct which has caused, or has the potential to cause, disruption to the Department's working relationships with its clients, the courts, and local governments.

> Conduct that has caused, or has the potential to cause, disruption among members of the Department workforce and could have a negative impact on attracting and retaining the most qualified employment candidates.

> Conduct that has damaged, or has the potential to damage, the public's perception of the Department's ability to conduct its operations and mission.

> Conduct that compromises your ability to perform your responsibilities as an Assistant Attorney General.

> Inappropriate, unprofessional behavior toward your supervisors and co-workers.

> Ignoring advice and counsel of your supervisors.

> Conduct which has resulted in a variety of offenses, a criminal violation, and a civil warning regarding various statutes or ordinances including, but not limited to: [Driving under the influence, trespass.]

Following his termination, Shirvell filed a grievance challenging the grounds for termination, arguing that the Department did not have just cause to terminate him under the CSRs. Shirvell also filed a claim to recover unemployment benefits.

In the grievance proceeding,[1] the circuit court affirmed the Commission's finding that the Department had just cause for termination because Shirvell engaged in "conduct unbecoming a

---

[1] Docket No. 316146 (circuit court case no. 12-001089-AA).

-4-

state employee." The circuit court reasoned that Shirvell's conduct interfered with the Department's mission and effectiveness and therefore was not protected under the First Amendment. This Court granted Shirvell leave to appeal the circuit court order in Docket No. 316146.[2]

In the unemployment compensation case,[3] the UIA determined that Shirvell was disqualified for benefits under the "misconduct" provision of the Michigan Employment Security Act (MESA), MCL 421.1 *et seq.* The MCAC affirmed the UIA, but the circuit court reversed, reasoning that Shirvell engaged in protected speech and therefore could not be denied benefits on the basis that his speech activities amounted to misconduct. This Court granted the Department and the UIA leave to appeal that order.[4] This Court consolidated the three appeals in separate orders.[5]

We proceed by first setting forth the evidence that was introduced at the grievance hearing before discussing the evidence introduced at the unemployment compensation hearing.[6]

## A. GRIEVANCE PROCEEDING

Following his termination, on November 15, 2010, Shirvell filed a grievance with the Department, claiming that his discharge was without just cause and was arbitrary and capricious. On January 18, 2011, the Department denied the grievance. Shirvell appealed the decision to the Commission and a hearing officer held a hearing on October 19 and October 20, 2011.

At the hearing, Douglas Bramble, the Department's former human resources manager, testified that he initiated disciplinary proceedings against Shirvell based on Shirvell's conduct regarding the blog and the television interviews. Bramble explained that the Department was concerned with the content of the blog, including the swastika directed at Armstrong and other accusations Shirvell made against Armstrong and Armstrong's friends. The Department was also concerned that U-M issued a trespass warning to Shirvell. Bramble stated that the Department began receiving telephone calls and e-mails from people concerned that an employee

---

[2] *Shirvell v Dep't of Attorney General*, unpublished order of the Court of Appeals, entered November 15, 2013 (Docket No. 316146).

[3] Docket Nos. 314223, 314227 (circuit court case no. 12-000344-AE).

[4] *Shirvell v Dep't of Attorney Gen*, unpublished order of the Court of Appeals, entered October 11, 2013 (Docket Nos. 314223, 314227).

[5] *Shirvell v Dep't of Attorney Gen*, unpublished order of the Court of Appeals, entered November 15, 2013 (Docket No. 316146); *Shirvell v Dep't of Attorney Gen*, unpublished order of the Court of Appeals, entered August 8, 2014 (Docket Nos. 314223; 314227; 316146).

[6] The Department cites a decision in *Armstrong v Shirvell*, Case No. 2011-CV-11921, which involved a civil defamation action. However, we will not consider that case in resolving the issues presented because it is an improper expansion of the administrative records. See *Reeves v Kmart Corp*, 229 Mich App 466, 481, n 7; 582 NW2d 841 (1998).

-5-

of the Department would engage in this type of conduct. Bramble testified that the Department received numerous e-mails and telephone calls regarding Shirvell's behavior, necessitating, for a time, the Department to appoint an individual to work full-time to handle the complaints. Bramble and other officials within the Department appointed Michael Ondejko, an investigator within the Criminal Division, to conduct a formal investigation.

During his investigation, Ondejko interviewed 40 individuals including Armstrong and several of his friends and associates. Generally speaking, the interviewees recounted their contacts with Shirvell, their reactions to his blog postings pertaining to them, their concerns about the effect his blog would have on their futures, their fear for Armstrong's safety, and the truth or falsity of certain statements Shirvell made about them on Facebook or on his blog. In particular, Ondejko reported that Armstrong claimed that Shirvell was outside his house on at least three separate occasions. Armstrong told Ondejko that on September 4, 2010, Shirvell was outside taking pictures after the police were called in response to a loud party complaint. Ondejko reported that during the disciplinary conference, Shirvell admitted to calling the police and photographing their arrival on September 4, 2010. Armstrong also told Ondejko that on September 6, 2010, Shirvell appeared outside his house with a protest sign and that, because he was concerned for his safety, he called the Ann Arbor Police and the U-M Department of Public Safety.

Ondejko testified that he was unable to prove that Shirvell made blog postings on his work computer. Further, he testified that he was unable to determine whether Shirvell used his work computer to post on social media sites like Facebook and Twitter.

Ondejko testified that he felt he was "given a free hand to investigate the case the way [he] saw fit." He testified that no one else helped him investigate the case, although Thomas Cameron, a bureau chief with the Department, reviewed drafts of his report. As part of the investigation, Ondejko testified that the Department forwarded him "thousands" of emails and records of telephone calls concerning complaints that citizens made about Shirvell. Ondejko referenced these in the report, but he could not include them all because of the extensive numbers. He testified that no one told him they wanted to fire Shirvell or that they wanted his report to provide enough ammunition to support termination. Further, he testified that he did not have a bias or prejudice against Shirvell when he conducted the investigation.

When Ondejko completed the report, the Department initiated a disciplinary conference with Shirvell and his counsel present. The conference lasted several hours and was to reconvene several days later. However, in the interim, Bramble and Cameron concluded that Shirvell had engaged in conduct unbecoming a state employee and recommended termination to Cox and Deputy Attorney General Carol Isaacs who agreed with the recommendation. Bramble explained that the Department always held attorneys within the office to "a very high standard of conduct, both personal and professional conduct." Bramble testified that the Department did not instruct its attorneys on how to carry out their personal lives, but the Department did have a "long history of expecting [attorneys] . . . to recognize . . . that you are a representative of the Attorney General . . . at all times." Bramble stated that as representatives of the Attorney General, it would be "common sense to behave accordingly. . . ."

Bramble explained that, during his short tenure with the Department, Shirvell was formally disciplined for a loud verbal altercation with Brad Beaver, his immediate supervisor, and for violating the Department's media-contacts policy for failing to inform the Department about his first televised interview. In addition to these violations, Bramble characterized Shirvell's conduct with respect to Armstrong as "very egregious." Bramble concluded that Shirvell had "compromised his ability to engage in the assigned duties and responsibilities of an Assistant Attorney General" to represent clients and the people of the state of Michigan. Bramble explained that it was not reasonable to reassign Shirvell within the Department and he stated that Shirvell's conduct affected the Department as a whole. He noted that other attorneys were being questioned about the conduct during unrelated proceedings.

Cox testified at the grievance hearing and agreed that he appeared on CNN where he stated that Shirvell had the right to say whatever he wanted regardless of how offensive his speech was.[7] He agreed that during the Cooper interview he was "very candid and said that he

---

[7] An audio recording of Cox's interview with Cooper was admitted into evidence at the grievance hearing. In the interview, Cox said that Shirvell was still employed at that time "for a number of reasons." Specifically, Cox stated,

> Here in America, we have this thing called the First Amendment, which allows people to express what they think . . . and engage in political and social speech.

> And, more on point, the Supreme Court, both the United States Supreme Court in 1995 in a case called *US v Treasury Employees* said that civil service employees in the federal system, and, by extension, in the state system, have free First Amendment rights outside of the work, as long as it doesn't impact their performance . . . at their job.

> And Mr. Shirvell is sort of a front-line grunt assistant prosecutor in my office. He . . . does satisfactory work. And off-hours, he's free to engage, under both our civil service rules, Michigan Supreme Court rulings, and the United States Supreme Court rule . . . to engage in free speech.

When asked if Shirvell's conduct was "unbecoming of a State employee," Cox stated that Shirvell's actions were "offensive" and then added that "conduct unbecoming is one of those empty-vessel statements" and that "what it means has never really been flushed out." When asked if Shirvell's behavior was generally "unbecoming," Cox answered "certainly," and then elaborated that it was "unbecoming of civil discourse" and that it was "unbecoming of common courtesy." However, he again noted that Shirvell was engaging in speech on a blog, and noted that if there was "conduct that's verified" such as a PPO, then the Department "could start looking at things." When asked if Shirvell was "detracting from [the] agency's effective operation," Cox said that he thought it was "quite a stretch" and that Shirvell's blogging was "not impacting the mission of the office." Finally, Cox stated that Shirvell was being a bully using the Internet, but noted again that the speech was protected under the First Amendment.

thought Mr. Shirvell's conduct was offensive." He also agreed that he said Shirvell was being a bully, but stated that Shirvell's conduct did not interfere with the mission of the office. However, Cox testified that, at the time he gave the interview, he had not read the entire blog. After reading the entire blog, Cox was "shocked" at the contents and came to believe that Shirvell's conduct threatened the mission of the Department. Thus, according to Cox, his statements during the Cooper interview were made prior to him conducting a thorough investigation into Shirvell's comments and writings.

Cox testified that a number of things shocked him about the blog, including Shirvell's seeming "obsession" and "infatuation" with Armstrong, Shirvell's "outing" of an individual from a small town in Michigan's Upper Peninsula and then "crowing about it," and that Shirvell described conduct that Cox, based on his prior experience as a prosecutor, considered stalking behavior. Cox stated that, in his view, merely because the Washtenaw County Prosecutor did not charge Shirvell was not dispositive as to whether Shirvell violated Michigan's anti-stalking statute. Cox testified that when he appeared for the Cooper interview he was also unaware of several things about Shirvell including the verbal altercation he had with Beaver. Thus, Cox explained that when he said to Cooper that Shirvell was not impacting the Department's mission, his statement was "accurate from the perch that I was at."

Cox explained why he agreed with the recommendation to terminate Shirvell as follows:

> This, in my mind, was in stunning detail, an overwhelming case to terminate Mr. Shirvell. [The investigative report] outlined escalating behavior. It outlined behavior separate from the blog that dealt with not only his behavior in the workplace but also his behavior outside the workplace, some which I would call minimally misdemeanant criminal, meaning stalking. Other behavior that would undermine the office in its daily operations. Some of it nuts and bolts but also some of it, you know, in the sense of it was conduct that one does not expect and should not accept from a state employee, especially a state employee in the Attorney General's office . . . .

Cox testified that Shirvell was engaging in conduct that was "inviting" a civil lawsuit, but was aware that Shirvell was not concerned about a civil lawsuit because he viewed himself as "judgment proof." Cox testified that Shirvell's attitude showed that he "wasn't concerned to the impact he was having on other individuals in the office."

Former Solicitor General Eric Restuccia was ultimately responsible for the Appellate Division where Shirvell worked. Restuccia testified that he first learned of the blog in May 2010, through an e-mail that was sent to him. Restuccia confirmed with the Department's ethics officer that blogging was permissible and he did not attempt to force Shirvell to remove the blog. Instead, he spoke with Shirvell to ensure that Shirvell was not engaging in political activity on state time or using state resources and also to assure that Shirvell was not identifying himself as an assistant attorney general.

According to Restuccia, he spoke with Shirvell about the blog and explained that it was not helping Shirvell and that it was not good to have people complaining about him to his supervisors. He later added that he told Shirvell the blog would cause "problems in terms of

[his] standing" within the Department. He also testified that he may have suggested Shirvell take the blog down. However, it is undisputed that he did not order Shirvell to take the blog down. Restuccia explained that he had no authority to order the blog be taken down.

Restuccia testified about a similar incident that occurred in February 2010, when he spoke with Shirvell about an "ugly" e-mail that Shirvell sent during work hours. The e-mail was sent to a former state representative in response to the representative's e-mail concerning a planned demonstration on issues involving gay rights and it read:

> You are all sick freaks. Absolutely shameful [] Your e-mail is beyond offensive. The grassroots will NEVER let you and your butt-buddies . . . hijack our pro-life, pro-family party in pursuit of your PERVERTED radical homosexual agenda.

Shirvell's e-mail contained another statement directed at a man named Justin, which read as follows:

> P.S. Justin(e), a persistent rumor in D.C. circles is that you and Illinois Log Cabin "Republican" Congress "man" [] hooked-up together. Sick. Sick. SICK! ! ! ! ! Does your homosexual lover Steve know? Freak.

Shirvell admitted to sending the e-mail from his personal e-mail account while he was on lunch. Restuccia testified that he and Joel McGormley, division chief at the time, spoke to Shirvell because they were concerned that Shirvell was engaging in political activity on work time. He said that he explained to Shirvell that the e-mail was obviously not work-related and reminded him that employees were not supposed to engage in political activity on work time or use work resources. Restuccia testified that he told Shirvell the e-mail was not helping him in the Department and that it reflected badly on him. Shirvell testified that the meeting was minor and lasted "maybe less than five minutes." Shirvell stated that Restuccia and McGormley told him that the e-mail was "no big deal" and not to worry about it. To his knowledge, no writing about the incident was prepared or placed in his personnel file.

In August 2010, the Department's communications office informed Restuccia that Shirvell conducted an interview with WXYZ, a local news channel in Detroit, and that the Department was receiving media inquiries about its anti-cyber-bullying campaign. At that point, Restuccia explained that he "really went through the blog," and "that's when I fully understood that this is exclusively dedicated to Chris Armstrong and that all of the columns were about and related to Chris Armstrong." Restuccia testified that when he looked at the blog, he thought it was "disheartening because it was so angry, caustic." He thought that the blog was more of an "attack" than something intended to be persuasive. Restuccia explained that he told Shirvell that the blog "undermined his professional credibility." He indicated at the time of the WXYZ interview, the Department was pushing an anti-cyber-bullying policy. He explained that when he spoke with Shirvell, he informed Shirvell that the Department had been "sandbagged by the press" who were showing the connections between Shirvell's behavior and the cyber-bullying policy." Restuccia testified that Shirvell "was undermining the Attorney General's efforts to protect the community." Cox wanted to "make sure that children in our community are safe and

we don't have people who are engaging in inappropriate comment and here you have then one of his assistants who's, you know, directing it toward a 21-year-old. . . ."

Restuccia initially attempted to prohibit Shirvell from conducting any further interviews, but ultimately Cox informed Restuccia that the Department could not restrict Shirvell's speech outside the office. Restuccia told Shirvell that he was not prohibited from conducting interviews, but that the interviews would reflect poorly on him. Restuccia added that he tried to make Shirvell understand that he would look "absurd" if he conducted the interviews. Restuccia testified that although Shirvell was humiliated by the WXYZ interview, Shirvell believed he could be "more effective" on CNN. Restuccia testified that it was "evident" that Shirvell's "whole focus was in on his kind of political crusade and [that he] had lost all sense of proportion for his role in the office." Restuccia testified that he "had no authority as supervisor to limit [Shirvell's] First Amendment right to engage in activity outside the office," so he told him as a friend that it would be bad for him.

According to Restuccia, during the time between the WXYZ and CNN interviews, Shirvell became "more isolated" and the incident with Beaver occurred. Restuccia explained that the CNN interview was a "disaster" that "disgraced" and crippled the Department. The Department was inundated with a "huge response" from citizens and it received "thousands" of calls and e-mails. Restuccia stated that the situation was "beyond our control."

Other evidence admitted at the hearing illustrated the impact that Shirvell's conduct had on the Department. A bureau chief for the Department asserted that the Department received over 20,000 complaints about Shirvell's conduct. The November 9, 2010 executive summary of the investigative report indicated that the "Department has received over 22,000 emails, over 150 letters, and 940 phone calls – nearly all criticizing AAG Shirvell's conduct." Further, it indicated that "[t]he office has been inundated with media calls, the office has since had to issue several press releases, and the Attorney General has had to appear on national news to defend the integrity of the office."

Restuccia explained that, given all of the events related to Shirvell's blog and the media frenzy that followed:

> [T]here is no role that Andrew Shirvell could provide for the state ever again. He has been irrevocably undermined, he has no credibility. In the eyes of the community and the legal community he is the paradigm of the bigot. If we were forced to somehow retain him or bring him back . . . my recommendation would be that he [be] given no assignment . . . and be given nothing to do because there is nothing that he can do for the office that would not then cast doubt on its credibility and legitimacy. There is nothing further he can do for the office.

Shirvell testified that he worked for both of Cox's campaigns for Attorney General; he worked in non-attorney roles for the Department from 2003 through 2007, when he was offered a position as an assistant attorney general. Shirvell eventually worked in the Appellate Division, where Beaver, McGormley and Restuccia were his superiors.

In April 2010, Shirvell started the blog after reading an article about Armstrong in the *Detroit Free Press*. Shirvell admitted that he wrote everything in the blog and he believed everything he wrote was true at the time he wrote it. Shirvell explained that Restuccia and Isaacs spoke with him about the blog in May 2010, but they did not instruct him to take the blog down.

Shirvell initially agreed to the WXYZ interview on condition that the reporter, Ross Jones, not ask questions about the Department or his role within the Department. Shirvell stated that he received a written reprimand for appearing for the interview without first notifying the Department. He stated that he read the Department's media contacts policy and did not think that it applied to him.

After the WXYZ interview, according to Shirvell, "things began to change at the office." Shirvell testified that his relationships with his superiors were "much different, much different, much different." Additionally, Shirvell was approached by CNN and Comedy Central about two more nationally-televised interviews and, ultimately, he agreed to the interviews. Shirvell stated that he agreed to the interviews on condition that he not be asked about his role within the Department. However, he was aware that during the WXYZ interview he was asked about his role as an assistant attorney general and there was nothing in writing stating that reporters would not ask about the Department.

Shirvell testified that he thought he could work for the Department in some capacity; he explained that his personal views never interfered with his responsibilities at work. Shirvell noted that, sometime after McGormley learned of his blog, McGormley assigned him to work on a gay-marriage issue. Shirvell explained that McGormley stated that he had done a good job with the assignment and he disputed the contention that McGormley did not know about the blog at the time of the assignment.

Shirvell defended the content of the blog, stating that he believed everything he wrote on the blog at the time that he wrote it. Shirvell admitted calling Armstrong a "privileged pervert" and stated that he thought that Armstrong engaged in a "perverted" lifestyle by being gay. Shirvell also agreed that he compared one of Armstrong's rallies to the "KKK" because there were no minorities at the rally. Shirvell admitted writing a blog post about Armstrong's "secret boyfriend," but denied that he "outed" the boyfriend.

On March 21, 2012, the hearing officer issued a lengthy opinion denying Shirvell's grievance and finding that the Department proved by a preponderance of the evidence that Shirvell's discharge was for just cause. The hearing officer summarized the content of the blog as follows:

> The hearing officer will not in this decision go into great detail regarding these "blog" postings, but review of them makes it clear that the grievant was obsessed with Armstrong, his homosexuality, the fact that he came from a monied [sic] background, and the fact that he had political connections with individuals (such as Speaker of the House Nancy Pelosi . . .) whose politics were diametrically opposed to those of the grievant. Review of the "blog" postings reveals that the grievant engaged in some of the most hateful speech imaginable.

-11-

He sought to and in fact did "out" individuals whose homosexuality had been their private concern until his intervention.

\* \* \*

It is clear from this record, however, that the actual basis for the appalling acts of harassment directed at Armstrong and his acquaintances by the grievant, however, was their homosexuality. It is clear that the Order of Angell issue, while it may have been of some concern to the grievant, was used as a pretext in an effort to couch the most vile hate speech in a constitutionally protected form. All one needs to do is read the "blog" article after article, to realize that the dominant theme is Armstrong's "disgusting" or "perverted" lifestyle.

The hearing officer continued, determining that there was a sufficient nexus between Shirvell's conduct and his employment with the Department such that the termination did not violate the First Amendment. The hearing officer reasoned that Shirvell's interviews cast the Department in a negative light and necessitated Cox appearing on national television to explain the Department's position. The hearing officer concluded that Shirvell engaged in "conduct unbecoming a state employee" under the CSRs that justified his termination, reasoning as follows:

By accepting the invitations to appear on the Cooper program and The Daily Show, the grievant made a media spectacle of himself and cast the Department . . . in a negative light. He did so paying attention to his own interests and disregarding the interests and reputation of his employer. The testimony in the record indicates that not only did the grievant create a great deal of scrutiny from the media, that scrutiny generated a tidal wave of condemnation from the public in the form of . . . thousands of telephone calls, emails and letters. This impacted the DAG and its ability to successfully carry out its mission . . . . [I]t is clear that there was a substantial expression of concern by . . . clientele that an agency who would retain such an employee would be unable to represent their interests.

\* \* \*

The speech engaged in by the grievant is of the most base, hateful sort . . . . This speech, generating the negative publicity that it did . . . is conduct unbecoming any state employee, let alone a state employee working as an Assistant Attorney General.

\* \* \*

The sexual orientation of an individual is a matter protected by Civil Service rules. That protection applies not only to state employees, but also to the general public when it prohibits an appointing authority from engaging in such discrimination in the hiring or recruitment process. The conduct of the grievant in creating a media circus around the hate speech against homosexuals in his "blog" could well impact the ability of the DAG to recruit and hire otherwise qualified

-12-

individuals if they felt that their sexual orientation might be an issue with an agency that continued to employ such a truculent, intolerant individual. The focus of the "blog" postings . . . are determined to have been motivated by the grievant's obsession with the sexual orientation of Chris Armstrong and the fact that Armstrong had been elected by the student body to be the leader of their student government. For reasons known but to himself, the grievant could not bear the thought of Armstrong being elected to such a position.

* * *

The hearing officer would not countenance the pursuit and harassment of any member of a group protected by Civil Service rules on the scale demonstrated here as being worthy of any state employee.

* * *

All State of Michigan employees work for all of the citizens of this state. Assistant Attorneys General not only work for the citizens of this state, but are responsible to assure that the legal rights of those citizens are protected. The citizenry needs to be able to have faith that their government and its employees are there to serve and protect the citizens, all citizens, even those whose conduct may seem repugnant to them.

* * *

The grievant has been determined . . . to have engaged in harassing conduct of the basest sort . . . The fact that the grievant deliberately made a media spectacle of himself and the department for which he worked without regard for the interests of his employer constitutes conduct unbecoming a state employee.

Shirvell appealed the hearing officer's decision to the Employment Relations Board (ERB) and moved to admit several e-mails which Shirvell claimed amounted to newly-discovered evidence. On July 12, 2012, the ERB granted in part and denied in part the motion to admit the e-mails[8] and affirmed the hearing officer's decision. The ERB held that the Department had just-cause to terminate Shirvell where Shirvell's conduct interfered with the internal operations of the Department and tarnished the credibility of both Shirvell and the Department. The ERB also found that Shirvell's behavior and disregard for the advice of his superiors made it impossible to trust his judgment.

---

[8] According to Shirvell, the e-mails showed that Armstrong "utilized high-powered Hollywood publicist Howard Bragman to manipulate the media and bring public pressure . . . to terminate [Shirvell.]"

On August 13, 2012, the Commission approved the recommendations of the ERB and adopted the ERB's decision as its final decision on the matter. Shirvell appealed the Commission's ruling to the circuit court.

Following oral argument, in an April 18, 2013, opinion and order, the circuit court affirmed the Commission's order. The circuit court held there was competent, material, and substantial evidence on the whole record to support the finding of just cause to terminate Shirvell's employment. The court noted that Shirvell's off-duty conduct resulted in the Department receiving more than 22,000 e-mails, 150 letters, and nearly 950 phone calls; in addition, the Department was inundated with media contacts and had to assign staff members to solely deal with the outcry resulting from Shirvell's conduct. Further, the court found that there was evidence that demonstrated the Department's reputation was damaged by Shirvell's off-duty actions. Specifically, there was evidence that the Department's cyber-bullying initiative was questioned and that two organizations issued resolutions condemning Shirvell's actions and questioning the Department's ability to carry out its mission. Finally, there was evidence that Shirvell's off-duty conduct damaged the Department's image of employing law-abiding personnel. Specifically, the court noted that Shirvell had multiple police contacts, that stalking charges were considered, that Armstrong sought a PPO, and that Shirvell was banned from the U-M campus for a time. The circuit court also concluded that the First Amendment did not preclude the Department from disciplining Shirvell in this case.

Finally, the circuit court concluded that Shirvell's termination was not arbitrary and capricious because even without the information gathered in the allegedly biased internal investigation, there was sufficient evidence in support of his termination. Further, the court noted that Shirvell had not produced any evidence in support of his assertion that the result of the investigation was pre-ordained. This Court granted Shirvell's application for leave to appeal the circuit court order.

B. UNEMPLOYMENT BENEFITS PROCEEDING

Shirvell filed his claim for unemployment compensation on November 17, 2010. The UIA issued a determination that Shirvell was disqualified for benefits under the "misconduct" provision of the MESA. The UIA found that Shirvell was terminated for "conduct unbecoming a State employee" by targeting individual members of the public in a manner that could be construed as an invasion of privacy, libel, or slander. The agency also found that Shirvell's conduct "has caused or has the potential to cause disruption" to the Department's working relationship with its clients and the courts.

Following Shirvell's protest, the UIA issued a redetermination that Shirvell was disqualified for benefits because of misconduct and Shirvell appealed the redetermination. Thereafter, a hearing referee held a hearing, where both Shirvell and Bramble offered testimony similar to the testimony offered at the grievance hearing discussed above. Specifically, Bramble testified that the Department received hundreds of telephone calls and e-mails from the public following Shirvell's televised interviews. Bramble also testified that attorneys within the Department were being questioned about Shirvell during unrelated proceedings and noted the Michigan Civil Rights Commission and the Ann Arbor City Council passed resolutions condemning Shirvell's conduct. Bramble testified that the Department concluded that Shirvell

-14-

could no longer serve as an assistant attorney general. In addition, evidence showed that Shirvell gave televised interviews and exhibits were introduced at the hearing including the termination letter, excerpts of the blog, and a transcript of Cox's CNN interview.

Following the hearing, on September 2, 2011, the referee issued a decision and order affirming the UIA's decision to deny Shirvell unemployment benefits. The referee concluded,

> The claimant . . . was responsible for assisting the Attorney General in performing of his official duties. Those duties included serving the State of Michigan and its subordinate agencies and working with municipalities. Without passing on the issue of whether or not the claimant's speech concerning the MSA student president represented activities [were] protected under the First Amendment, it is concluded that the claimant's speech did have an adverse impact on the performance of the employer's duties. The employer had to deal with numerous public inquiries concerning the claimant. At least two of the public entities with which the employer had to deal professionally issued public resolutions critical of the claimant and calling on the employer to take action concerning the claimant. Finally, the Attorney General himself felt it necessary to occupy his time in addressing on national television the claimant and his speaking activities, time which could have been productively spent in addressing other pressing duties.

> It is concluded that the claimant's activities, including those concerning the student president, the claimant's violation of the employer's media policy, and his outburst at work against his supervisor, taken individually may not have amounted to statutory misconduct. Taken together, however, they adversely affected the ability of the employer to execute its duties to such an extent that they represented misconduct under the Act. The claimant therefore is disqualified for benefits under the misconduct provision of the Act. Because he is disqualified, he must requalify.

Shirvell appealed the referee's decision to the MCAC. On February 27, 2012, the MCAC affirmed the referee's decision after reviewing the entire record, concluding that the decision was "in conformity with the facts as developed at the . . . hearing" and that the referee had "properly applied the law to the facts."

Shirvell appealed the MCAC's decision to the circuit court, and the circuit court reversed. The court reasoned that the MESA's misconduct provision, MCL 421.29(1)(b), and the related caselaw was inapplicable because Shirvell's activities amounted to constitutionally-protected speech and the government could not deny Shirvell a benefit because of his speech. The circuit court found that it was undisputed that Shirvell was terminated because of his speech and concluded that the blog and related political activities amounted to protected speech. The circuit court further held that all other disciplinary actions against Shirvell did not amount to misconduct under the MESA. The Department and the UIA moved for reconsideration, and the circuit court denied the motion. The circuit court expressly declined to apply the First Amendment balancing-test set forth in *Pickering v Bd of Ed*, 391 US 563, 568; 88 S Ct 1731; 20 L Ed 2d 811 (1968), holding that the test was inapplicable in the context of unemployment

-15-

benefits. This Court granted the Department's and the UIA's applications for leave to appeal the circuit court order. This Court consolidated the appeals with Shirvell's appeal in the grievance proceeding.

## II. STANDARD OF REVIEW

In Docket No. 316146 (the grievance proceeding), Shirvell contends that the circuit court erred in affirming the Commission's order that he was terminated for just cause and he argues that exercising his First Amendment right to free speech cannot constitute "conduct unbecoming a state employee" under the CSRs. Shirvell also contends that his termination was arbitrary and capricious.

In Docket Nos. 314223 and 314227, the Department and the UIA argue that the circuit court erred in holding that Shirvell was entitled to unemployment benefits because his speech was protected under the First Amendment and therefore could not constitute "misconduct" under the MESA.

The circuit court addressed and decided the issues raised by the parties; therefore, they are preserved for our review.[9] *Reed v Reed*, 265 Mich App 131, 163; 693 NW2d 825 (2005).

"A final agency decision is subject to court review but it must generally be upheld if it is not contrary to law, is not arbitrary, capricious, or a clear abuse of discretion, and is supported by competent, material and substantial evidence on the whole record." *VanZandt v State Employees' Retirement Sys*, 266 Mich App 579, 583; 701 NW2d 214 (2005). "This Court reviews a lower court's review of an administrative decision to determine whether the lower court applied correct legal principles and whether it misapprehended or misapplied the substantial evidence test to the [agency's] factual findings, which is essentially a clearly erroneous standard of review." *Id*. at 585. "'Substantial evidence' is that which a reasonable mind would accept as adequate to support a decision, being more than a scintilla, but less than a preponderance of the evidence." *Id*. at 584. These appeals also involve the proper interpretation and application of relevant statutes and the First Amendment, both of which involve questions of law that we review de novo. *Elba Twp v Gratiot Co Drain Comm'r*, 493 Mich 265, 277-278; 831 NW2d 204 (2013).

## III. ANALYSIS

## A. FIRST AMENDMENT

---

[9] In Docket Nos. 314223 and 314227, Shirvell argues that the UIA waived review of the issues in its brief on appeal because it did not file a brief or participate in formal oral argument in the circuit court. However, the issues raised by the Department and the UIA are essentially identical and the circuit court addressed and decided the issues; therefore, we will consider them preserved for our review.

The over-arching issue in these cases involves whether Shirvell's speech and speech-related activities were protected under the First Amendment. In the event that Shirvell's activities were protected under the First Amendment, then the governmental entities involved could not penalize Shirvell—i.e. either terminate him or deny him unemployment benefits—because of his speech. Thus, we proceed with our First Amendment analysis before addressing the statutory and administrative grounds for termination and denial of unemployment benefits.

"The First Amendment protects the speech and association rights of an individual . . . no matter how different, unpopular or morally repugnant society may find his activities." *Melzer v Bd of Ed*, 336 F 3d 185, 192 (CA 2, 2003). Government employees do not forfeit their constitutionally-protected free speech interest by virtue of accepting government employment. See, e.g., *Rankin v McPherson*, 483 US 378, 383; 107 S Ct 2891; 97 L Ed 2d 315 (1987) ("It is clearly established that a State may not discharge an employee on a basis that infringes that employee's constitutionally protected interest in freedom of speech.") However, while an employee does not forfeit their free speech interests by virtue of holding government employment, "the State has interests as an employer in regulating the speech of its employees that differ significantly from those it possesses in connection with regulation of the speech of the citizenry in general." *Pickering v Bd of Ed*, 391 US 563, 568; 88 S Ct 1731; 20 L Ed 2d 811 (1968). Thus, "[w]hen a citizen enters government service, the citizen by necessity must accept certain limitations on his or her freedom." *Garcetti v Ceballos*, 547 US 410, 418; 126 S Ct 1951; 164 L Ed 2d 689 (2006); see also *Dishnow v School Dist*, 77 F 3d 194, 197 (CA 7, 1996) ("True it is that speech which could not be prohibited by the state if uttered by a private person may be a lawful basis for discharge or other discipline when uttered by a public employee.") This is because, "[g]overnment employers, like private employers, need a significant degree of control over their employees' words and actions; without it, there would be little chance for the efficient provision of public services." *Garcetti*, 547 US at 418. "Public employees, moreover, often occupy trusted positions in society. When they speak out, they can express views that contravene governmental policies or impair the proper performance of governmental functions." *Id*. at 419.

In *Pickering*, 391 US at 568, the United States Supreme Court addressed whether a public employee was wrongfully terminated for exercising his First Amendment right to free speech and explained that resolution of the issue required "arriv[ing] at a balance between the interests of the . . . [employee], as a citizen, in commenting upon matters of public concern and the interest of the State, as an employer, in promoting the efficiency of the public services it performs through its employees." Under the *Pickering* framework, an employee is entitled to protection under the First Amendment if he or she spoke as a private citizen on a matter of public concern and where the state cannot show that its interest in the efficient provision of public services outweighs the employee's interest in commenting on the matter of public concern.

*Pickering*, 391 US at 563; *Rankin*, 483 US at 384. Because these cases involve the denial of benefits because of Shirvell's speech, we proceed by applying the *Pickering* framework.[10]

### (1) Private Citizen/Public Concern

The first prong of the *Pickering* framework "serves a gatekeeping function" because "[t]he First Amendment protects an employee only when he is speaking 'as a citizen upon matters of public concern' as opposed to when he speaks only on matters of personal concern." *Melzer*, 336 F 3d at 193, quoting *Connick v Myers*, 461 US 138, 147; 103 S Ct 1684; 75 L Ed 2d 708 (1983). In the event that an employee's speech involves a matter of personal concern, the government has broad discretion to deal with the employee as it deems fit without "any special burden of justification. . . ." *United States v Nat'l Treasury Employees' Union*, 513 US 454, 466; 115 S Ct 1003; 130 L Ed 2d 964 (1995), citing *Connick*, 461 US at 148-149. "If, however, the speech does involve a matter of public concern, the government bears the burden of justifying its adverse employment action." *NTEU*, 513 US at 466.

Whether an employee spoke as a citizen on a matter of public concern involves a question of law for the court to decide. *Rorrer v City of Stow*, 743 F3d 1025, 1047 (CA 6, 2014). Resolving this issue requires consideration of "the content, form, and context of a given statement, as revealed by the whole record." *Connick*, 461 US at 147-148. "[P]ublic concern is something that is a subject of legitimate news interest; that is, a subject of general interest and of value and concern to the public at the time of publication." *San Diego v Roe*, 543 US 77, 83-84; 125 S Ct 521; 160 L Ed 2d 410 (2004). "But the speech need not address a topic of great societal importance, or even pique the interest of a large segment of the public. . . ." *Craig v Rich Twp High School Dist 227*, 736 F 3d 1110, 1116 (CA 7, 2013) (quotation marks and citations omitted). "That the public was not large, that the issues were not of global significance . . . [does] not place [] speech outside the orbit of protection." *Dishnow*, 77 F 3d at 197. Moreover, "[t]he inappropriate or controversial character of a statement is irrelevant to the question whether it deals with a matter of public concern." *Rankin*, 483 US at 387.

In this case, the parties do not dispute that Shirvell spoke as a private citizen. Additionally, we need not devote a prominent part of this opinion to determine whether Shirvell's speech touched on a matter of public concern. Assuming, as Shirvell argues, that his speech touched on a matter of public concern, it was a matter of very limited public concern. Our review of the blog postings and Shirvell's "protest" activities leads us to conclude that the vast majority of the speech was dedicated to discussing the sexual orientation of Armstrong and Armstrong's acquaintances. Armstrong was the president of a student body and as such, he did not hold prominent public office. He was not involved in a highly-publicized political campaign. Moreover, the evidence showed that the media attention Shirvell received was focused on the fact that Shirvell, an assistant attorney general, was orchestrating a campaign against Armstrong using tactics that could reasonably be construed as harassment and cyber-bullying. Nevertheless,

---

[10] To the extent that the circuit court in Docket Nos. 314223 and 314227 held that *Pickering* did not apply in cases involving unemployment benefits, we hold that conclusion constituted legal error.

for purposes of our analysis, we assume that Shirvell spoke as a private citizen on a matter of public concern.

## 2. *Pickering-Connick* Balancing Test

"An employer does not necessarily violate the First Amendment by discharging an employee that speaks out on a matter of public concern." *Craig*, 736 F 3d at 1118. "The government is entitled to restrict speech that addresses a matter of public concern if it can prove that the interest of the employee as a citizen in commenting on the matter is outweighed by the interest of the government employer in promoting effective and efficient public service." *Id.*, (quotation marks and citations omitted); see also *Connick*, 461 US at 149-150. "[T]he State's burden in justifying a particular discharge varies depending upon the nature of the employee's expression." *Connick*, 461 US at 150. In evaluating the government's interests, proper focus is placed on the "effective functioning of the public employer's enterprise" and "[i]nterference with work, personnel relationships, or the speaker's job performance can detract from the public employer's function; avoiding such interference can be a strong state interest." *Rankin*, 483 US at 388. Furthermore, it is not necessary "for an employer to allow events to unfold to the extent that the disruption of the office and the destruction of working relationships is manifest before taking action." *Connick*, 461 US at 152. Rather, "the governmental employer may defeat the [employee's] claim by demonstrating that it reasonably believed that the speech would potentially interfere with or disrupt the government's activities, and can persuade the court that the potential disruptiveness was sufficient to outweigh the First Amendment value of that Speech." *Pappas v Giuliani*, 290 F 3d 143, 146 (CA 2, 2002) (quotation marks and citations omitted).

In balancing the competing interests under *Pickering*, courts consider several factors to guide their analysis; these non-exhaustive factors may include consideration of whether the employee's speech: (1) impaired discipline by superiors, (2) detrimentally impacted close working relationships, (3) undermined a legitimate goal or mission of the employer, (4) impeded the performance of the speaker's duties, and (5) impaired harmony among co-workers. *Meyers v City of Cincinnati*, 934 F 2d 726, 730 (CA 6, 1991), citing *Rankin*, 483 US at 388. As noted above, it is sufficient if the governmental employer can show a reasonable likelihood that the speech may lead to any of these adverse impacts. See *Connick*, 461 US at 152; *Pappas*, 290 F 3d at 146. Additionally, the content of the speech is relevant to determine "[t]he degree of disruption or potential disruption necessary to justify [the governmental action]." *Craig*, 736 F 3d at 1119. "The less serious, portentous, political, significant the genre of expression, the less imposing the justification that the government must put forth in order to be permitted to suppress the expression." *Eberhardt v O'Malley*, 17 F 3d 1023, 1026 (CA 7, 1994).

A brief review of caselaw is illustrative of the degree of disruption or potential disruption that is necessary to justify suppression of a public employee's speech. For example, in *Pickering*, 391 US at 569, a public school teacher wrote a letter to the editor of a local newspaper criticizing the school board's allocation of funds between athletics and education. The school board then terminated the teacher for writing the letter. *Id.* at 566. The Supreme Court held that the termination violated the teacher's First Amendment right to freedom of speech. *Id.* The Court reasoned that the teacher's interests in speaking on a matter of public concern outweighed any interest asserted by the school board where, in part, there was no indication that the speech

"interfered with the regular operation of the schools generally" or impacted the teacher's "proper performance of his daily duties in the classroom." *Id*. at 572-573.

Similarly, in *Rankin*, 483 US at 378, the Court held that the respondent's termination violated the First Amendment where the governmental entity, the Constable of Harris County, Texas, failed to show that the respondent's speech impacted the internal affairs of the office. In that case, the respondent was employed as a clerical worker where she did not have any contact with the public. *Id*. at 380-381. On March 30, 1981, in response to a radio news bulletin on the attempted assassination of President Ronald Reagan, the respondent remarked to a co-worker, "if they go for him again, I hope they get him." *Id*. at 381. Upon learning of the statement, the Constable terminated the respondent, concluding that she was unfit to work for a law enforcement agency; the respondent filed suit. *Id*. at 390. After concluding that the respondent's speech touched on a matter of public concern, the Supreme Court concluded that the Constable failed to show that the speech "interfered with the efficient functioning of the office." *Id*. at 389. Specifically, the Court considered the nature of the respondent's role within the office and that the respondent did not have any contact with the public, explaining:

> in weighing the State's interest in discharging an employee based on any claim that the content of a statement made by the employee somehow undermines the mission of the public employer, some attention must be paid to the responsibilities of the employee within the agency. The burden of caution employees bear with respect to the words they speak will vary with the extent of authority and public accountability the employee's role entails. Where, as here, an employee serves no confidential, policymaking, or public contact role, the danger to the agency's successful functioning from that employee's private speech is minimal. [*Id*. at 390-391.]

In contrast, the Second Circuit Court of Appeals[11] has held that protecting a government agency's reputation can be a legitimate state interest that can outweigh a public employee's right to speak as a private citizen on a matter of public concern. In *Pappas*, 290 F 3d at 143, an officer of the New York Police Department (NYPD) anonymously replied to several non-profit mail solicitations with racist and anti-Semitic diatribes. When the officer's identity was revealed, his conduct and the NYPD's subsequent investigation garnered media attention and the officer was ultimately dismissed. *Id*. at 145. In discussing the governmental interests at stake, the court explained:

> The effectiveness of a city's police department depends importantly on the respect and trust of the community and on the perception in the community that it enforces the law fairly, even-handedly, and without bias . . . . If the police department treats a segment of the population of any race, religion, gender, national origin, or sexual preference, etc., with contempt, so that the particular

---

[11] "Though not binding on this Court, federal precedent is generally considered highly persuasive when it addresses analogous issues." *Wilcoxon v Minn Mining & Mfg Co*, 235 Mich App 347, 360 n 5; 597 NW2d 250 (1999).

minority comes to regard the police as oppressor rather than protector, respect for law enforcement is eroded and the ability of the police to do its work in that community is impaired. Members of the minority will be less likely to report crimes, to offer testimony as witnesses, and to rely on the police for their protection. When the police make arrests in that community, its members are likely to assume that the arrests are a product of bias, rather than well-founded, protective law enforcement. And the department's ability to recruit and train personnel from that community will be damaged. [*Id*. at 146-147.]

The court concluded that the NYPD's interests in preserving its reputation and relationship with the public outweighed any interest the officer had in distributing his racist literature, concluding:

For a New York City police officer to disseminate leaflets that trumpet bigoted messages expressing hostility to Jews, ridiculing African Americans and attributing to them a criminal disposition to rape, robbery, and murder, *tends to promote the view among New York's citizenry that those are the opinions of New York's police officers. The capacity of such statements to damage the effectiveness of the police department in the community is immense.* Such statements also have a great capacity to cause harm within the ranks of the Police Department by promoting resentment, distrust and racial strife between fellow officers. In these circumstances, an individual police officer's right to express his personal opinions must yield to the public good. The restrictions of the First Amendment do not require the New York City Police Department to continue the employment of an officer whose dissemination of such racist messages so risks to harm the Department's performance of its mission. In the words of Justice Holmes, "A policeman may have a constitutional right to [speak his mind], but he has no constitutional right to be a policeman." [*Id*. at 147, quoting *McAuliffe v Mayor of New Bedford*, 155 Mass 216, 220; 29 NE 517 (1892) (citations omitted) (emphasis added).]

Similarly, in *Locurto v Giuliani*, 447 F 3d 159 (CA 2, 2006), the Second Circuit Court of Appeals held that concerns of the NYPD and the New York Fire Department (FDNY) about potential damage to reputation and potential disruption justified the termination of several former police officers and fire fighters for their participation in a racist parade float. The court explained,

It [is] . . . obvious . . . that police officers and firefighters who deliberately don 'blackface,' parade through the streets in mocking stereotypes of African-Americans and, in one firefighter's case, jokingly recreate a recent vicious hate crime against a black man, might well damage the relationship between the NYPD and FDNY and minority communities.

* * *

The members of the African-American and other minority communities whose reaction to the float the [government] legitimately took into account . . .

-21-

cannot properly be characterized as 'outsiders seeking to heckle [the plaintiffs] into silence'. . . . Rather, effective police and fire service presuppose respect for the members of those communities, and the defendants were permitted to account for this fact in disciplining the plaintiffs.

* * *

*The First Amendment does not require a Government employer to sit idly by while its employees insult those they are hired to serve and protect.* [*Id*. at 182-183 (quotation marks and citations omitted) (emphasis added).]

Turning to the present case, initially, we note that Shirvell appears to contend that the Department had a heightened burden to justify regulating his speech because, according to Shirvell, his speech was not directed at criticizing the Department and was "wholly unrelated to his employer." This argument is unpersuasive.

In *NTEU*, 513 US at 457-459, the Supreme Court addressed whether a federal employer could prohibit a low-level employee from receiving payment for speeches that were unrelated to his employment. In rejecting the prohibition, the Court held that, in order to restrict an employee's speech that "has nothing to do with their jobs," the employer needed to provide a justification that was "far stronger than mere speculation." *Id*. at 465, 475. To the extent that Shirvell relies on *NTEU*, that reliance is misplaced. Here, unlike in *NTEU*, Shirvell engaged in deliberate conduct that irreconcilably linked his speech with his employer. See *Roe*, 543 US at 80-81 (holding that *NTEU* was inapplicable where the plaintiff deliberately linked his speech to his public employment as a police officer). Specifically, Shirvell sat for televised interviews to defend his speech where he was identified as an assistant attorney general. Importantly, Shirvell agreed to the interviews despite having knowledge that he could be asked about his position as an assistant attorney general. During his first locally-televised interview, Shirvell was identified as an assistant attorney general and was asked questions about his position within the Department. Nevertheless, Shirvell subsequently agreed to two additional interviews with CNN and Comedy Central where he was again identified as an assistant attorney general and asked about his position with the Department. Although Shirvell refused to answer questions about his position, he was inextricably linked to the Department. In agreeing to the public interviews, Shirvell took deliberate steps that linked his speech to his employer. Accordingly, to the extent that Shirvell relies on *NTEU*, we find that reliance erroneous.

In the present case, the Department introduced evidence to show that its interests in the effective provision of governmental services outweighed Shirvell's speech interests. The facts and circumstances involved in this case are dissimilar to *Pickering* and *Rankin* and more akin to *Pappas* and *Locurto*. Here, unlike in *Pickering* and *Rankin*, the Department introduced evidence during both proceedings that showed that Shirvell's speech interfered with the Department's internal operations and adversely affected the efficient provision of governmental services. The Department received numerous e-mails, telephone calls and letters in response to Shirvell's televised interviews. Department staff members were questioned about Shirvell during unrelated proceedings and the Michigan Civil Rights Commission and the Ann Arbor City Council issued resolutions condemning Shirvell's behavior and questioning the Department's ability to fulfill its mission. It was clear in both proceedings that Shirvell's speech created a media firestorm which

in turn created a public-relations crisis. The Department dedicated resources to respond to media inquires about Shirvell and ultimately Cox found it necessary to take time to appear for a nationally-televised interview to defend the Department's response to Shirvell's conduct. Furthermore, irrespective of whether the 20,000 plus complaints were part of an "organized campaign" by a "Hollywood publicist," as Shirvell contends, the complaints nevertheless negatively impacted the Department's internal operations.

Additionally, in the termination letter, the Department stated that Shirvell's conduct had "caused or has the potential to cause, disruption among members of the Department workforce and could have a negative impact on attracting and retaining the most qualified employment candidates." Evidence introduced at both proceedings supported that Shirvell's speech had, or was reasonably likely to have, a detrimental impact on close working relationships and harmony among co-workers within the office.

At the grievance hearing, Shirvell testified that after his televised interviews, "things began to change at the office," and he stated that his relationship with his superiors was "much different, much different, much different." This, of course, is of no surprise. Clearly, Shirvell's publicity tour created tension within the office. Shirvell's superiors, particularly, Restuccia and Cox, through the public relations department, were forced to defend the integrity of the Department in general and its anti-cyber-bullying initiatives in particular. Ultimately, Cox found it necessary to devote time to appear on CNN to defend the Department's integrity. According to Cox, Shirvell had no concern as to whether his conduct impacted others within the office. Additionally, Restuccia testified that Shirvell had "lost all sense of proportion for his role in the office" and was focused on his own political crusade. Restuccia stated that Shirvell became "more isolated" after the interviews and was involved in a heated verbal altercation with his immediate supervisor Beaver, for which he was disciplined. Given the tension that Shirvell's publicity tour created within the office, it was reasonable for the Department to conclude that Shirvell's present and future relationships with co-workers would be negatively impaired.

Similarly, evidence at both hearings showed that Shirvell's speech negatively impacted, or was reasonably likely to negatively impact, close working relationships and harmony among co-workers. Evidence showed that Shirvell's conduct placed added stress and pressures on his superiors. He was involved in a heated altercation with his immediate supervisor, Beaver, for which he was disciplined. Furthermore, the Department could have reasonably concluded that Shirvell's conduct had the potential to detrimentally impact Shirvell's working relationships and serve a detriment to the Department's recruiting efforts. Although there was no evidence to support that Shirvell's conduct had negatively impacted the Department's recruiting efforts at the time he was terminated, as the *Rankin* Court explained, it was not necessary for the Department "to allow events to unfold to the extent that the disruption of the office and the destruction of working relationships is manifest before taking action." *Rankin*, 461 US at 152. It was reasonable for the Department to conclude that Shirvell's conduct could negatively impact the working relationships within the Department in the future. Indeed, in *Pappas*, 290 F 3d at 147, the court explained that an officer's dissemination of racist, bigoted print materials had a "great capacity to cause harm within the ranks of the Police Department by promoting resentment, distrust and racial strife between fellow officers." Like in *Pappas*, here, Shirvell's speech had a great capacity to cause similar harm within the ranks of the Department by potentially promoting

distrust amongst the Department's present or future gay, bi-sexual and transgender employees or recruits.

Evidence also showed that Shirvell's conduct undermined one of the Department's specific missions—i.e. the integrity of its anti-cyber-bullying campaign. By employing an individual such as Shirvell, whose conduct Cox agreed amounted to bullying, the Department undermined its own message. Common evidence in both proceedings showed that, at the time Shirvell conducted his televised interviews, the Department had promoted a cyber-bullying initiative and worked to educate children about cyber-bullying. Shirvell's conduct clearly undermined these initiatives and the Department was forced to defend the integrity of the initiatives. Shirvell repeatedly attacked Armstrong in the blog, and, at times, the attacks could reasonably be construed to be directed at Armstrong simply because he is gay. Shirvell placed a swastika flag on a photograph of Armstrong's face, stood outside Armstrong's residence with picket signs, appeared at events that Armstrong attended, and posted private information about Armstrong's personal life on the Internet. Shirvell made numerous demeaning remarks about Armstrong, likening him to a Nazi and a member of the KKK, referring to him as "Satan's representative" on the MSA, and a "privileged pervert." Shirvell referred to Armstrong, a male, in the feminine gender when he likened Armstrong to a "handmaiden" presumably because of Armstrong's sexual orientation. Cox stated that Shirvell was "clearly a bully" who used the Internet to be a bully and engaged in conduct that was "unbecoming of civil discourse" and "unbecoming of common courtesy." Given the nature of Shirvell's speech and speech-related activities, it was reasonable for the Department to conclude in its termination letter that Shirvell's conduct either damaged or had the potential to damage the public's perception in its ability to "conduct its operations and mission."

Moreover, Shirvell's speech and related conduct damaged both Shirvell's ability to perform his responsibilities and the Department's overall ability to perform its mission. Critically, in this case, unlike the employee in *Rankin*, Shirvell's position as an assistant attorney general required him to make public appearances in court as a representative for *all* the state's citizens. The Department, as the chief law enforcement agency in the state, represents *all* of the citizens of Michigan irrespective of race, gender, sexual orientation, religion, or creed. See, MCL 14.35. It has a legitimate interest in facilitating the "respect and trust of the community" and in advancing "the perception in the community that it enforces the law fairly, even-handedly, and without bias." *Pappas*, 290 F 3d at 146-147. Indeed, like the public entities in *Pappas* and *Locurto*, the Department's effective provision of services, "presuppose[s] respect for the members of [minority] communities . . . " including gay individuals. *Locurto*, 447 F 3d at 183. Irrespective of his attempts to disassociate his role with the Department from his "campaign" against Armstrong, Shirvell's conduct reasonably could have created the impression that neither he nor the Department enforced the law in a fair, even-handed manner without bias. Shirvell was a representative of the Department who appeared in court on behalf of the Attorney General and on behalf of the citizens of Michigan. By appearing on local and national television defending speech and conduct that could reasonably be construed as bigoted and homophobic as well as engaging in stalking-like behavior while at the same time being identified as an assistant attorney general, like the officers in *Pappas*, Shirvell first created, then perpetuated the impression that his opinions were the opinions of the Department. See *Pappas*, 290 F 3d at 147.

For these reasons, it was reasonable for the Department to conclude in the termination letter that Shirvell was unable to perform his duties as an assistant attorney general. Particularly, the Department could have reasonably concluded that Shirvell compromised his ability to appear in court as a representative of the entire citizenry of the state when, in the words of Restuccia, Shirvell had lost all credibility and had become the "paradigm of the bigot." And, although Shirvell argues that he was assigned to summarize a gay-marriage case and performed the task well, the assignment occurred before the media firestorm had fully erupted and it did not involve a public court appearance. Certainly, after Shirvell engaged in multiple media interviews defending the blog, it would be difficult for Shirvell to credibly appear in court as a representative of the entire citizenry including segments of the population including gays or victims of harassment and stalking. The evidence presented in this case clearly supported the Department's conclusion that Shirvell could no longer perform the duties of an assistant attorney general.

Shirvell's conduct also jeopardized the Department's ability to effectively perform its overall mission—i.e. chief legal enforcement agency for the entire citizenry of the state. Despite Cox's efforts to disavow Shirvell's statements, Shirvell's crusade created the appearance that the Department could not fairly represent the interests of gays or victims of harassment or stalking. If the Department were to appear to treat these segments of the population with contempt or bias, respect for the Department would significantly be diminished not only within the legal profession, but also within the wider public as a whole. Thus, similar to the interests of the officers in *Pappas* and *Locurto*, here, Shirvell's "right to express his personal opinions must yield to the public good." *Pappas*, 290 F 3d at 147. The First Amendment did not require the Department to preserve the employment of an individual whose continued harassment and stalking of a minority and dissemination of bigoted, homophobic statements risked harming the Department's integrity and its mission. *Id.*

Indeed, this case is very similar to *Pappas*. Like the officer in *Pappas*, who initially disseminated racist literature anonymously, here, Shirvell initially maintained his blog anonymously. Like the offensive content in *Pappas*, here, Shirvell's blog contained offensive content that gave rise to a media firestorm. The governmental concerns noted by the court in *Pappas* apply with equal force here. When an employee of the Department disseminates bigoted, homophobic speech, and then trumpets that speech in a media parade, such conduct "tends to promote the view among [Michigan's] citizenry" that "those are the opinions" of the Department. *Pappas*, 290 F 3d at 147. The First Amendment did not require the Department to "sit idly by while its employee[] insult[ed] those [he was] hired to serve and protect." *Locurto*, 447 F3d at 183.

In sum, in both proceedings the Department met its burden to prove that its interests in the efficient provision of public services outweighed Shirvell's speech interests. *Pickering*, 391 US at 563. Accordingly, Shirvell's speech was not protected under the First Amendment for

-25-

purposes of these proceedings and neither the termination nor the denial of unemployment benefits offended the constitution.[12] *Id*.

### B. JUST-CAUSE FOR TERMINATION

In Docket No. 316146, Shirvell argues that the circuit court erred in affirming the Commission's ruling that the Department had just-cause to terminate him.

In order to discipline an employee protected by the civil service rules, the employer must have "just cause." Civ Serv R 2-6.1(a). "Just cause includes . . . [c]onduct unbecoming a state employee." Civ Serv R 2-6.1(b). Permissible discipline includes "[d]ismissal from the classified service." Civ Serv R 2-6.1(c). Although discipline should generally be progressive, "if an infraction is sufficiently serious, an appointing authority has the discretion to impose any penalty, up to and including dismissal, provided the penalty is not arbitrary and capricious." Civ Serv R 2-6.1(d).

In this case, Shirvell was dismissed for conduct unbecoming a state employee. The CSRs do not define the phrase "conduct unbecoming a state employee," nor do the parties cite any binding authority interpreting the phrase. *Random House Webster's College Dictionary* (2000) defines "unbecoming" as "detracting from one's appearance, character, or reputation; unattractive or unseemly." Consistent with this definition, the New Jersey Supreme Court has defined the phrase "conduct unbecoming," as "an elastic one that has been defined as any conduct which adversely affects the morale or efficiency of the bureau . . . [or] which has a tendency to destroy public respect for municipal employees and confidence in the operation of municipal services." *Karins v City of Atlantic City*, 152 NJ 532, 554; 706 A 2d 706 (1998) (quotation marks and citations omitted). We find this definition aligns with the commonly-understood meaning of the term as set forth in the dictionary and it encompasses conduct that the CSRs intended to discourage. Therefore, we adopt the definition set forth in *Karins* as our own and hold that, "conduct unbecoming a state employee" encompasses any conduct that adversely affects the morale or efficiency of the governmental entity or tends to adversely affect public respect for state employees and confidence in the provision of governmental services. *Id*.

In this case, evidence at the grievance hearing supported that Shirvell engaged in conduct unbecoming a state employee in that his speech and speech-related conduct undermined his professional character and reputation, adversely affected the Department's internal operations, and had a tendency to destroy public respect for the Department and confidence in the Department's ability to provide services. *Id*. Here, Shirvell was an assistant attorney general. Generally speaking, the attorney general represents the State of Michigan, the governor, the secretary of state, and the treasurer or the auditor general. MCL 14.28; MCL 14.29. In addition, as an elected official, the Attorney General is a representative of the entire citizenry of the state. The Attorney General is obligated to give his or her opinion on all questions of law submitted by the Legislature, the governor, the auditor general, the treasurer, or any other state official. MCL

---

[12] Given our resolution of the First Amendment issue, we need not address the Department's argument in Docket No. 314223 regarding preclusion.

14.32. Further, the Attorney General has supervisory powers over the prosecuting attorneys in this state. MCL 14.30. The Attorney General is permitted by statute to appoint assistant attorneys general who may "appear for the state in any suit or actions before any court or administrative body, or before any grand jury, with the same powers and duties and in like cases as the attorney general." MCL 14.35. Accordingly, it is reasonable that as a legal representative of the State of Michigan, the conduct of an assistant attorney general should be held to a higher standard than the average private citizen.

Shirvell failed to adhere to this standard when he engaged in conduct that brought disrepute to himself and the Department. As discussed above, Shirvell directed numerous personal attacks at Armstrong and Armstrong's acquaintances, attacks that his superior, Cox, characterized as "unbecoming of common courtesy" and "unbecoming of civil discourse." Some of the attacks could reasonably be construed to have been directed at Armstrong at least in part because of Armstrong's sexual orientation. Shirvell equated Armstrong with the KKK and the Nazis. He accused Armstrong of engaging in casual "gay sex," hosting "gay orgies" in his dorm, and accused him of being racist and an elitist. Shirvell posted comments identifying individuals as gay and accused individuals of having sexual relations with Armstrong. In doing so, Shirvell showed no concern for Armstrong's privacy and he identified individuals as gays who previously had not announced their sexual orientation. Shirvell freely admitted to contacting Representative Pelosi's office to speak against Armstrong. Furthermore, he admitted that he called the police to Armstrong's home, took photographs of their arrival at the home, and then posted a blog entry declaring that the police "raided" Armstrong's party presumably in an attempt to convey that Armstrong was caught engaging in criminal activity. Additionally, Shirvell appeared on television interviews defending his conduct and the media firestorm and public backlash that followed was neither beneficial to the Department's reputation nor the Department's internal operations. The nature of Shirvell's conduct certainly had a tendency to destroy public respect and confidence in both Shirvell individually and the Department in general. *Karins*, 152 NJ at 554. As discussed above, Shirvell's conduct tended to suggest that neither he nor the Department could enforce the law in a fair and even-handed manner and the Department could reasonably have concluded that Shirvell could no longer credibly represent the entire citizenry of the state. Shirvell cast himself and the Department in a negative light and he evinced a disregard for the negative effects that his conduct had on the Department. In doing so, Shirvell engaged in conduct unbecoming a state employee.

In sum, the circuit court applied the correct legal principles and did not misapprehend or grossly misapply the substantial evidence test when it concluded that there was competent, material, and substantial evidence on the record to support the Commission's determination that Shirvell engaged in conduct unbecoming a state employee under the CSRs such that there was just-cause for termination. *Polania v State Employees' Retirement Sys*, 299 Mich App 322, 327-328; 830 NW2d 773 (2013).

Next, Shirvell argues that, even if there was evidence to support the finding that his conduct amounted to "conduct unbecoming a state employee," his termination was nevertheless arbitrary and capricious.

In the grievance proceeding, the issue before the circuit court was whether or not the Commission's final decision was authorized by law and supported by competent, material, and

substantial evidence on the whole record. Const 1963, art 6, § 28. Relevant to this issue, a decision is unauthorized by law if it is in violation of a statute or the constitution or if it is arbitrary and capricious. *Northwestern Nat'l Cas Co v Comm'r of Ins*, 231 Mich App 483, 488; 586 NW2d 563 (1998). A decision is arbitrary if it is "fixed or arrived at through an exercise of will or by caprice, without consideration or adjustment with reference to principles, circumstances or significance." *Mich Farm Bureau v Dep't of Environmental Quality*, 292 Mich App 106, 141; 807 NW2d 866 (2011). A decision is "capricious" if it is "apt to change suddenly, freakish or whimsical." *Id*.

Shirvell argues that irrespective of the First Amendment issues, the decision to discharge him was arbitrary and capricious. He contends that Ondejko was biased and conducted his investigation with a preconceived notion that Shirvell would be discharged. In support of his claim, he asserts that Ondejko read the blog before his investigation and found it was merely an attack on Armstrong's sexuality; he had discussed the case with his family; his daughter issued an outrageous public message indicating that Ondejko had been "swamped" with the case and expressing relief that "Michigan's gay-bashing, student-stalking assistant AG" was fired. Shirvell also contends that Ondejko spoke with Armstrong's attorney about the matter both before and after completing his internal investigatory report. Shirvell further asserts that Ondejko perjured himself at the hearing by testifying that Shirvell posted blog entries on state time using state resources, which he was forced to admit on cross-examination was a mistake. The circuit court determined that Shirvell provided no evidence in support of his assertion that the result of the investigation was pre-ordained.

Our review is limited to determining if the circuit court "applied correct legal principles and whether it misapprehended or grossly misapplied the substantial evidence test to the agency's findings." *Polania*, 299 Mich App at 327-328. In this case, the circuit court applied the correct legal principles, i.e., the legal standard for what constitutes arbitrary and capricious conduct, to the evidence introduced at the grievance hearing.

Bramble testified that the investigation was not initially started with the aim of discharging Shirvell. He explained that the Department was "very concerned and wanted to see exactly what happened, hear Mr. Shirvell's side of the story, and then review it within . . . the Civil Service Rules of possible disciplinary actions or counseling actions and look at all the different options available." To that end, an internal investigation was launched, a multiple-hour disciplinary conference was convened, and the Department considered moving Shirvell to a different position within the Department.

Further, the Department did not rush to discharge Shirvell because of disagreement with his speech. The record shows that the Department knew about the blog as early as May 16, 2010. The record further demonstrates after learning about the blog, Shirvell's superiors within the Department discussed with Shirvell the possible ramifications from his words and actions. They tried to persuade Shirvell not to engage in further media discussions. Shirvell chose not to heed their advice. Then, asserting Shirvell's constitutional guarantees, his superiors told Shirvell that he was not prohibited from further discussions with the media. Of importance was that this decision was expressly based on the Department's recognition of Shirvell's First Amendment rights. After Shirvell participated in interviews with national media, Cox initially went on national television and stated that Shirvell had the right to say whatever he wanted regardless of

how offensive it may be to a national viewing audience. Thus, the Department clearly did not interfere with Shirvell's First Amendment rights. Rather, the Department went to great lengths to protect his First Amendment rights. Further, in an effort to essentially protect Shirvell, his superiors counseled against conducting further media interviews, though this advice was seemingly offered in friendship, and out of a genuine concern for Shirvell's future in the law, rather than as an employment directive. The investigation into Shirvell's conduct began after it became clear that Shirvell's conduct was interfering with the Department's internal operations. Though Shirvell argues to the contrary, there is no record evidence to support his factual or legal conclusions. Accordingly, the circuit court applied the correct legal principles and did not err in finding that the termination was neither arbitrary nor capricious. *Northwestern Nat'l*, 231 Mich App at 488.

## C. DENIAL OF UNEMPLOYMENT BENEFITS

In Docket Nos. 314223 and 314227, the Department and the UIA argue that the circuit court erred in reversing the MCAC's order affirming the UIA's finding that Shirvell was disqualified for unemployment benefits under the MESA.

A person must be eligible to receive unemployment benefits under the MESA. Initially, an individual must meet certain threshold requirements set forth in MCL 421.28 such as, among other things, filing a claim for benefits and seeking employment. See e.g. MCL 421.28(1)(a), (b), (c); *Braska v Challenge Mfg Co*, ___Mich App___; ___NW2d___(2014) (Slip op. at 7). However, even if an individual meets the threshold requirements in MCL 421.28, he or she may nevertheless be disqualified from receiving benefits under MCL 421.29, which provides in relevant part as follows:

> (1) [] [A]n individual is disqualified from receiving benefits if he or she:
>
> * * *
>
> (b) Was suspended or discharged for *misconduct connected with the individual's work. . . .* [Emphasis added.]

Although the statute does not define the term "misconduct," our Supreme Court has construed the term as follows:

> The term misconduct, as used in connection with disqualification of an employee for unemployment compensation benefits, is limited to conduct evincing such willful or wanton disregard of an employer's interests as is found in deliberate violations or disregard of standards of behavior which the employer has the right to expect of his employee, or in carelessness or negligence of such degree or recurrence as to manifest equal culpability, wrongful intent or evil design, or to show an intentional and substantial disregard of the employer's interests or of the employee's duties and obligations to his employer. . . . [*Carter v Employment Security Comm*, 364 Mich 538, 541; 111 NW2d 817 (1961) (quotation marks and citations omitted).]

A finding of misconduct can be based on a single event or on a "series of derelictions and infractions" that, by themselves, would not rise to the level of misconduct. *Christophersen v Menominee*, 137 Mich App 776, 780; 359 NW2d 563 (1984). Thus, "misconduct" is "established if the series of acts under scrutiny, *considered together*, evince a wilful disregard of the employer's interests." *Id*. at 781 (emphasis in original). Furthermore, "Michigan does not require that the employee's conduct arise from his or her official duties, so long as it negatively affects the employer's interests." *Bowns v City of Port Huron*, 146 Mich App 69, 76; 379 NW2d 469 (1985). Moreover, it is not necessary that the employee intend the precise consequences of his or her actions. *Bell v Appeal Bd of Mich Employment Security Comm*, 359 Mich 649, 652-653; 103 NW2d 584 (1960).

This Court has previously addressed whether off-duty conduct by a public employee amounted to "misconduct" under the MESA. In *Bowns*, 146 Mich App at 72, the claimant, worked as a patrol officer for the City of Port Huron Police Department. The department did not have any rules or regulations governing the behavior of off-duty police officers. *Id*. During an undercover investigation at a local bar where "sports betting, bookmaking and high stakes poker games" were alleged to be taking place, a detective observed the claimant playing a hand of poker and socializing with patrons who appeared to be involved in gambling activities. *Id*. at 72-73. The claimant did not report the activity to his superiors and he was later terminated for "conduct unbecoming a police officer and for neglect of duty." *Id*. at 73. The circuit court affirmed the Michigan Employment Security Commission's ruling that the claimant was disqualified for unemployment benefits because he engaged in "misconduct connected with his [] work". *Id*. at 74. This Court affirmed, explaining, "[t]his Court has recognized that illegal *or improper* conduct by employees in positions of public trust may undermine their ability to function in an official capacity and damage the prestige of the public employer." *Id*. at 75 (emphasis added). This Court concluded the claimant committed misconduct connected with his job where his "off-duty association with, and limited participation in, gambling activities . . . seriously interfered with his employer's interests" and "cast a cloud over his ability to maintain public trust. . . ." *Id*. at 77-78.

In this case, review of the entire record from the unemployment compensation hearing shows that there was competent, material, and substantial evidence to support that Shirvell engaged in misconduct under the MESA. When viewed in totality, Shirvell's behavior evinced a willful disregard of the Department's interests and he disregarded standards of behavior that the Department had a right to expect of him. *Carter*, 364 Mich at 541.

Of critical importance in this case is that Shirvell was in a position of public trust. He was appointed by the Attorney General, an elected official in a position of public trust, to assist in carrying out the powers and duties of the Attorney General. See MCL 14.35; *In re Watson*, 293 Mich 263, 270; 291 NW 652 (1940). The Attorney General is tasked with representing the State and its interests in legal proceedings and is the chief law enforcement office of the State. See MCL 14.28. As an elected official, the attorney general serves all of the citizens of Michigan, irrespective of race, creed, religion, gender or sexual orientation. Thus, the Department had a real and substantial interest in maintaining neutrality and conducting its operations in a non-biased manner; the public actions of its employees, therefore, were critical in protecting this interest. Internally, the Department has an interest in efficiently fulfilling its role, which may include maintaining a harmonious and inclusive work environment, recruiting and

-30-

hiring top talent and maintaining good client relationships. Shirvell's public "campaign" against Armstrong undermined all of these interests.

Shirvell's conduct cast a cloud over both his and the Department's ability to maintain the public trust and severely tarnished the Department's reputation. Although Shirvell waged his "campaign" during his own time, he was inextricably linked to the Department. During televised interviews, Shirvell claimed he spoke as a "private citizen," however, it was unmistakable that he worked for the Department. Seemingly, what made Shirvell of interest to the national media was the fact that he was employed by the Attorney General. Interviewers consistently referred to Shirvell as an assistant attorney general and Shirvell was asked about his position within the Department. Although Shirvell declined to answer the questions, the Department was inextricably linked to Shirvell and engulfed in a wellspring of negative publicity. The Department was forced to clarify to the public that Shirvell did not represent its views, with Cox ultimately sitting for a nationally-televised interview in an attempt to distance the Department from Shirvell.

Evidence presented about the volume of calls to the Attorney General, the large portion of which were decidedly negative, supports the finding that Shirvell's conduct brought negative publicity to the Department and severely damaged the perception that it served all of the people of Michigan. Additionally, other assistant attorney generals were fielding questions about Shirvell's word and actions from judges throughout the State, causing distractions from their work within the courts.

As noted above, as an elected official, the Attorney General serves as a representative for the entire citizenry. It was reasonable for the Department to conclude that Shirvell's conduct made it appear to the public that the Department was unable to fairly represent the interests of all of the state's citizens. This was reinforced when the Ann Arbor City Council and the Michigan Civil Rights Commission passed referendums condemning Shirvell's behavior and questioning whether the Department could represent the interests of all Michigan's citizens. In addition, at the time Shirvell was publically defending his blog, the Department had a cyber-bullying initiative. Despite Shirvell's contentions to the contrary, it was reasonable for the Department to conclude that Shirvell's conduct had the potential to damage the public's perception in its ability to conduct its operations and mission where, for example, Shirvell's conduct directly undermined its campaign against cyber-bullying. Indeed, Cox admitted during his televised interview that Shirvell was using the Internet to be a bully. Furthermore, as noted above, it was reasonable for the Department to conclude that Shirvell's conduct would impair its ability to maintain an inclusive and diverse workplace and recruit the most talented individuals to work for the Department.

Shirvell's conduct also showed a disregard for the Department's interests in maintaining efficiency and good client relationships. As previously stated, the evidence confirmed the Department's contention that Shirvell's behavior had a negative impact on the operations of the Department. An official testified that the Department was "slammed" with a "massive amount," of telephone calls and e-mails expressing concerns about Shirvell's conduct and his role as an assistant attorney general. Shirvell acknowledged at the hearing that he was aware the Department was receiving communications from various members of the public pertaining to his blogging activities. Moreover, other employees of the Department were questioned regarding

Shirvell and his conduct even when they were attending to unrelated matters.  As previously stated, various judges and judicial staff made inquiries into the matter and gave "off the cuff opinions" about Shirvell's conduct.  Two public entities passed resolutions condemning Shirvell's behavior and calling upon the Department to support anti-hate crime and anti-bullying legislation.  These resolutions supported the Department's determination that Shirvell could no longer effectively serve as an assistant attorney general, as the Department could have reasonably inferred that its relationships with clients would be damaged and that future clients would object to having Shirvell represent their interests.  In short, Shirvell's conduct negatively impacted the Department's ability to maintain efficiency and supported the Department's conclusion that Shirvell was unfit to continue in his role as a representative of the Department.

Furthermore, other factors played a part in the termination.  At the same time Shirvell was caught in a wellspring of negative media attention, he was being disciplined for actions connected with his work.  Shirvell received a written reprimand for failing to follow the Department's media contact policy.  Then, he received a two-and-a-half day suspension without pay after a heated argument with his supervisor involving inappropriate language and threats.  Viewing the record in its totality, it is clear that there was substantial and compelling evidence to support the UIA's finding that Shirvell engaged in misconduct for purposes of the MESA and the circuit court erred in concluding otherwise.

## IV.  CONCLUSION

To summarize, we conclude that Shirvell's speech was not protected under the First Amendment for purposes of these proceedings.  Although Shirvell may have spoken as a private citizen on a matter of public concern, the Department introduced evidence at both proceedings to show that its interests in the efficient provision of governmental services outweighed Shirvell's speech interests.  Accordingly, neither termination of Shirvell's employment nor denial of unemployment benefits offended the constitution.  Therefore, in Docket No. 316146 we affirm the circuit court's order wherein the court properly held that there was competent, material, and substantial evidence on the whole record to support that there was just cause to terminate Shirvell and properly held that the termination was not arbitrary or capricious.  However, in Docket Nos. 314223 and 314227, we reverse the circuit court order wherein the court erred in concluding that Shirvell did not engage in misconduct that disqualified him for unemployment benefits under the MESA.  Shirvell's speech was not protected and there was competent, material, and substantial evidence introduced at the unemployment compensation hearing to support the UIA's determination that Shirvell engaged in misconduct such that he was disqualified for benefits under MCL 421.29(1)(b); therefore, remand for reinstatement of the MCAC's order in that case is appropriate.

In Docket No. 316146 affirmed; in Docket Nos. 314223 and 314227, reversed and remanded for further proceedings consistent with this opinion. A public question being involved, no costs awarded. MCR 7.219(A). *City of Bay City v Bay County Treasurer*, 292 Mich App 156, 172; 807 NW2d 892 (2011). We do not retain jurisdiction.

/s/ Stephen L. Borrello
/s/ Christopher M. Murray
/s/ Peter D. O'Connell